Vs. Bonneville Power Administration Good morning, I'm Melinda Davison, and in the interest of efficiency, the other petitioners have ceded their time to me. I would like to reserve 10 minutes of my time for rebuttal. Very good. May it please the Court, petitioners are respectfully requesting that you conclude, as a matter of law, that Bonneville Power Administration did not follow its own rules, those are the general rate schedule provisions referred to GRSPs, or the contracts. When it made its final decision to trigger the safety net crack, and the crack is the cost recovery adjustment clause, the fundamental difficulty with BPA's position in this case is they maintain that the trigger determination is a rate-making determination. But Bonneville goes on to admit in this record that the trigger determination was made before the 7i rate-making hearing process. The difficulty is that under the Northwest Power Act, all rate-making decisions of the Bonneville Power Administration have to occur in the context of the 7i rate-making process. I find this a puzzling case, and it's not aided by the new petitions for review that are filed from the latest FERC decisions. I didn't, the briefing hasn't been completed in those cases. Are you counsel on some of those cases, too? Yes, I am, Your Honor. Okay, so what are, are you alleging, are you attacking the trigger decision on those, in those petitions for review with our court, as well as this one? The... What I'm grappling with is this, and we'll explore with the BPA counsel when he argues, but if we make a decision in this case on trigger case, that affects that case quite a bit, and that case may well go to a different panel, and we may have two different decisions theoretically on this, which leads one to believe, where do we make, where is the judicial review of the trigger decision, or is there any? I think... Your Honor, I think that's a very good question, and my answer to that is, if you accept Petitioner's argument in this case, that renders the second case moot. Essentially, the relief that we are asking for is that you issue an order remanding this case back to Bonneville, asking them to incorporate the 76 million dollars in the Energy Northwest debt refinancing, and have them redo the trigger. Well, let me just take it one step at a time. At the 7i hearing, at the conclusion of that, if I'm reading the record correctly, BPA said, we are not going to revisit the trigger decision, and that's not part of the 7i hearing. Is that your understanding of that? That's absolutely correct, Your Honor. So then we go to the next stage, and FERC takes up the right, and they do it under their specific criteria, and FERC essentially, although I don't think they addressed it directly, FERC, if I'm reading it, if I'm reading between the lines, said we're not going to revisit that trigger decision either, because that's not part of ratemaking. Is that right? Is that your interpretation? That's correct, Your Honor. And that's the essence of our case, is that the trigger determination was a determination that happened before the 7i ratemaking process. And Bonneville admits that. It was a determination that happened separate and apart. In fact, the trigger determination, that series of two letters, is not even included in the 7i ratemaking process, hence the problem. If we had not made a challenge to the trigger determination as a final decision at the time that that was made, then if we had waited and challenged it at the time of the FERC final decision, Bonneville would have said, oh, no, you're too late. You can't challenge the trigger determination here. Look in the 7i rate case record. You won't even find the trigger determination in there. That's why we believe that this case, the trigger determination was a final decision. It was separate and apart from the ratemaking process, that the basic elements of rightness and finality are present here, and that it is appropriate for this Court to make a determination of whether or not Bonneville had to include the $76 million in its decision or in its trigger determination. There was this model run that they basically ran to make the decision of whether or not they had a greater than 50 percent probability of missing their next treasury payment. Now, to me, the odd result of all of that, if true, is that it results in piecemeal litigation in our Court that profoundly affects the outcome of subsequent proceedings at FERC and otherwise. So that would mean that you have to make an appeal of the trigger determination or file a petition within 30 days after the record of decision on that. And then it comes up here. Meanwhile, FERC is considering the rate adjustments. It would seem more logical to me to have all of that determined in the final FERC hearing. I mean, I agree with you. You need at least one bite of the apple. Why is it more logical to say the BPA, the administrator, should have considered taken up the trigger determination in the 7i proceedings and FERC should have dealt with it? I mean, that's the other aspect of it. Your Honor, I'm glad you've raised this point because I would like to explain why we believe that that analysis is actually not correct. Our view of this is not, as Bonneville suggests, that there's going to be a parade of horribles and that we'll be setting, you know, incredibly bad precedential case law in terms of having piecemeal litigation. This is a case of first impression, and it is a case that will not occur again. It is an incredibly unique set of circumstances that came about as a result of the Western power crisis. So the specific action here that we are asking you to consider is this unique one-time event, triggering of the safety net crack. And Bonneville's triggered it. They've triggered it for the remaining rate period, which is through October 2006. After that time period, we're done. We do not have a safety net crack again. So I do not believe, because this case is not about rate making, I do not believe that it has any precedent in terms of when a petitioner is able to challenge a rate-making decision down the road. So we believe this is very unique and probably will never, ever come before this Court again. If we agreed with you, I have another problem, in that you argue that the BPA arbitrarily ignored $315 million in anticipated bond refinances. Now, the BPA is charged to recover all of its costs in a timely manner. Why should the BPA rely on anticipated bond offerings? I mean, all that would be known at the time FERC sets the rates. So why would we consider that? Essentially, there are two categories of money that are at issue that we believe that Bonneville needed to consider when it ran its trigger determination. And the first category of money is the $76 million that Bonneville had cash on hand. That was unencumbered cash on hand that they had already received in the door for these Energy Northwest refinancings. The second category of money is the $315 million that you refer to. That money was in process. So it was very, very likely, even according to Bonneville's own documents, to materialize. It was already in process. But why wouldn't the proper time to consider that would be at the time the rates are set? That would be known. Would it not? You refer to anticipated. You say it's in process. So it doesn't seem premature for us to step in and make a decision at this time. Well, Your Honor, I can concede that point to you. I can say to you, disregard the $315 million. That was in process. It was likely to occur. But Bonneville didn't have that cash in hand. If you accept that Bonneville should have considered all of its cash on hand at the time it made its trigger determination, all you need is the $76 million. If you put the $76 million into the toolkit run, then you get a result that shows that Bonneville had a 53% probability of making its Treasury payment. I was just trying to point out and get back to Judge Thomas's, at what time is it best for us to review a decision? And this appears to be premature in a number of ways, because the final rate making will take place after the hearings and so forth. And I assume from one place it's no jurisdiction, but even a serving jurisdiction, if you concede that $315 million should not be considered, that eases my angst about that. Thank you. Yes, Your Honor. And I think in terms of the analysis about is this premature, simply comes down to a decision that the Court will make right up front. Is this rate making or is this not rate making? And if it is not rate making, as we believe it is not, then it is not a premature decision. It was a final decision subject to challenge at the time that the trigger determination was made. I think we understand your position. Do you want to save some time for rebuttal? Yes. Thank you. If you want to enlighten us on this. Pardon me? Sorry. Go ahead. May it please the Court. Good morning. My name is Kirk Cassad, representing Respondent Bonneville Power Administration. There were a number of either misstatements or misunderstandings in the opening argument. I'd like to correct those as we go through the argument today. First, there is no question that the trigger issue will be addressed by the Court. The question is when. We believe it should be addressed under the petitions that were filed after FERC granted final confirmation and approval. That's when it should be addressed and will be addressed. I don't the trigger decision is not rate making. No, you'd agree with that. It's a rate making determination. No, I disagree, Your Honor. It's a rate making determination. And the reason I disagree with that statement is that you have to look at this rate making process as a whole. The trigger determination was the start of the SN-CRAC process. There's no dispute about that. You can't take that out and pretend it's something that stands on its own. It's solely related to the SN-CRAC process. Now, before the formal hearing starts, you make that determination. Under the GRSPs that BPA established, that's what we're required to do. Right. But the rulemaking record under Section 9, the rulemaking record is not just the hearing record. It's not limited to the hearing record. 7i5 of the Northwest Power Act says it's not just the hearing record. It's additional documents that are developed by or submitted to the administrator. And when you have a preliminary determination like this, that's part of that rulemaking record, even if it's not part of the intervening hearing record. And so that is still a rate making determination, Your Honor. But I think, aren't you really arguing it's subsumed into the final rate? I mean, are you – I failed to see in this process where there's an independent look at the trigger decision. Am I missing something? FERC really didn't look back at that. They said, well, that's the trigger decision. Now we've got the hearing record. We have the entire record. We're going to make a determination on whether the rate is appropriate under the applicable act. It was addressed in the Section 7i formal evidentiary hearing, Your Honor. Well, what is it? I'm looking at the administrator's decision. I hope I've got the right page here. Yes, I'm looking. I'm now at, I think, Excerpt Record 161. And the administrator's final decision after the hearing is certain parties also raised issues that applied only to a trigger argument. Let's see. In summary, BPN noted the trigger determination was, in effect, a separate phase of the SN, correct, rate process made under GRSPs that needed BPA substantive evidentiary hearing. Because of this fact, there's no reason to revisit the trigger determination during the evidentiary hearing, and it would have been inappropriate to do so. We need to understand the context in which that statement was made, Your Honor, because what happened was that under the GRSPs, you make the initial trigger determination. BPA determines if there's a 50 percent or greater probability of missing its treasury payment. You just make that calculation, send a notice, held a workshop, that's it. It's a very quick procedural step just to start a hearing, because the hearing doesn't hurt anybody. It doesn't injure anybody. And so what happens is you make that initial determination. But you cannot have the hearing without that determination. Exactly. That's why it's part of the hearing. What if the determination is – in this case, you argue that it's an appropriate determination. That's an entirely separate question. Let's assume hypothetically that it's completely made up, that there is absolutely no basis to trigger the hearing. When do the opposing parties have the opportunity to challenge that when there's absolutely no basis for it? In the Section 7i hearing, where, in fact, they did challenge it, Your Honor. And I was just getting to that point, because that initial trigger thing is short, the parties, the GRSPs don't say, BPA, issue a report. BPA, hold a hearing. BPA, take comments from your customers. It's a quick determination by the administrator to start the hearing. It's reviewed then in the formal hearing itself, as they agree, because they were the ones that filed testimony in the hearing saying, let's revisit whether or not you did it properly. And the statement – We're not going to revisit that. That's a quick initial trigger. No, no, no. We didn't. See, this is where it's important for the Court to read that statement in its context in the record of decision. It's not artfully made. I grant you that, Your Honor. But what we had was a circumstance, you see, where Petitioners came into the hearing and they were saying, BPA, use new information that happened since the trigger determination to revisit your trigger determination. And we said, no, you can't do that. The trigger determination was made at a particular time based on the information at that time. You have to use the information at that time, as was described in the subsequent evidentiary record, to make that decision. We're trying to keep them from, you know, viewing this as some sort of final action that they can revisit and do anew in the hearing. What we're saying is that you can't do that. You have to look at the record in the hearing where it was fully litigated. Right. So it doesn't, the initial, I think the consequence, if I'm understanding you correctly, is that the initial determination is never subject to challenge. No, not at all, Your Honor. In fact, we have. I mean, I may be right, but if they can't revisit the initial determination in the hearing because it's based on subsequent evidence, and a FERC is limited in what it can do because it can only talk about the appropriateness of the rate within the guidelines, where does the party get to challenge the initial determination? Okay. I said that you can challenge the initial determination, as in many other cases of review, you have to do that based on the record existing at that time. Right. You can't second-guess the agency by saying later you should have used something you couldn't use. That's one point. Okay. Let me stop you right there. Isn't that what they're saying in this, that we want to revisit that initial determination based on the evidence of the time, and that's why it's a separate petition for review than all of the subsequent events that happened? And what I was speaking to, Your Honor, was your earlier question about the rationale for that particular statement. Now, if we want to know whether it was revisited, it's pretty straightforward. There are 22 single-spaced pages analyzing every single minute issue that was raised about the trigger determination. They filed initial testimony. BPA didn't move to strike that testimony and say it's outside the scope or that it wouldn't revisit it. Instead, if BPA didn't move to strike other parties' testimony, BPA said, well, bring it in. We'll litigate that. BPA filed responding testimony. They had an opportunity to cross-examine our witnesses on the trigger determination. Go ahead. No problem. They could file a brief. They did. We filed a draft record of decision. They had discovery. They filed a brief on exceptions. This was fully, fully litigated in the hearing, and there's no question about that. So in your view, does FERC have the authority to say you improperly triggered the determination? They do not. And in Central Lincoln II, we call it Central Lincoln II for short. It was the second case before this Court that had the same name, Central Lincoln People's Utility District v. Johnson. I'll call it Central Lincoln II. It was the Court's first review of BPA's rate sign for the Northwest Power Act. And there, this Court said, even if FERC does not have jurisdiction over the issue, you have to wait for judicial review until FERC's final approval order. And not only was it said in Central Lincoln II, but also in Public Utility Commissioner of Oregon v. Bonneville Power Administration, this Court said, when there was a procedural challenge to a rate-making methodology, this Court said, even though FERC cannot review that procedural issue, you have to wait until FERC has granted the final approval of that rate-making methodology before you can bring it before this Court. And again, as you referenced earlier, Your Honor, this is not the only issue that could have eliminated any possibility of an SN crack. I mean, I understand that. But I think we want to avoid, in terms of ruling here, is to say, all right, it's unripe now. And then for them later to then for you to come up later in the subsequent proceedings saying, no, no, you should have raised that way back when, and FERC doesn't have jurisdiction. This is a petition for review from the FERC order. It's beyond your jurisdiction to treat what the agency did. Because these petitions for review are from the FERC order. And FERC, as I read it, and I think you're probably right, doesn't have jurisdiction to determine whether or not you made an appropriate decision. That's the Administrator's decision. It may be logical, and it may be appropriate to wait until the end. I think it might be a much better process. But I don't, you know, we shouldn't be in the position of saying to people who want to challenge the trigger determination, you have to wait in the end, and whoops, now it's moved. And we will definitely, and I swear to you, Your Honor, we will definitely not make that argument. And a transcript of this argument can be used against us if we make any attempt to do so. Our position is consistently banned. And even in the record of decision, we said the trigger decision is the first phase of this rulemaking process that includes a hearing. It's the first phase, and therefore, it's reviewed as part. It's not a final action for purposes of judicial review. It's properly viewed as part of the whole. And you can't do one more hypothetical before. And I'm sorry about keeping you interrupted. No, please, please. Let's assume that you hadn't given proper notice. That was the second stage of the initial requirement. What would be the remedy for that, and when would the party have to assert that remedy? That would also be raised during the evidentiary hearing, Your Honor, because that would also be an alleged defect in the beginning of the hearing. It's one of the many substantive and procedural issues related to the final development of the yes-in crack. So same place, Your Honor. Okay. Also, I wanted to note that these Petitioners aren't the only Petitioners that challenged the yes-in crack trigger in that formal evidentiary hearing. There were numerous others that are not here today. And they're not going to be able to have their views heard. They will have their views heard if the Court reviews based on the final approval, because these parties are there, those parties are there, everybody's there at the same time. And also, there is a legitimate concern about piecemeal review. In Central Lincoln II, in fact, that was one of the primary points the Court made in Central Lincoln II. They were saying, you know, look, if we have to review a decision to start a hearing, an ex parte allegation, an issue that would totally remove any possibility of increasing rates, all those things would be brought up over time. There could be dozens of them. And the Court would have to address each of those on its docket. You've got potentially dozens of new cases, or the Court said, we can wait until the end where there's a definitive point where everything is certain to be final and address them all at that time. And that's what the Court said. The Court said judicial efficiency is particularly important here. And they're still provided their day in court. There's still no injury in terms of their ability to make their argument before this Court. And we will, we look forward to litigating this at the proper time. So if I may sum up what you're suggesting, if I can use a federal court analogy, is that they've taken, from your perspective, an improper interlocutory appeal, so to speak, from that crack determination. And that when this FERT decision comes up for review in this Court, those issues will remain ripe and viable, even though FERT did not have the authority to contest them. That is absolutely correct, Your Honor. And exactly what this Court said in Central Lincoln too. I understand that. It's puzzling to me that you have a record of decision and that we, of course, there are time limits that apply to filing petitions for you from records of decision and that we would say then, well, you don't need to comply with those. You can wait for four years down the road and challenge it later. I mean, it makes some sense, but it's not a perfect fit. Are you discussing the length of time it takes for FERC review to get a final? No. The jurisdictional, you know, the jurisdiction for filing a petition for review from a final agency decision in our Court. And under what? We just have to say it's nonfinal. I mean, but it doesn't become final until the action of another agency which has a jurisdiction over it. Yes. I mean, that's the puzzling part to me. It might be a bit puzzling, Your Honor, but we submit that it is the law. And consistent with both the Northwest Power Act and a number of cases before this Court, they've all come to that same conclusion, Your Honor. Any other questions? No, sir. Also, there was a comment that this is not ratemaking, and I addressed that earlier. I was making the point that like the trigger decision, and I may have made this earlier, so I'll be very brief here. There are a number of decisions that occur throughout the Esten Crack process that similarly could have made completely irrelevant the possibility of any Esten Crack, and, therefore, the trigger determination would have been irrelevant. And, in fact, indeed, during the Esten Crack hearing process, and it goes back and forth. It's fairly fluid during that hearing process. Parties present evidence. Some evidence suggests that if you did the analysis for determining the rate, which is completely separate from the trigger determination, just because there's a trigger determination, just because there's a trigger determination doesn't mean there's going to be a rate increase. You have to have the hearing to determine that. And so when you're conducting that hearing, at any time, you might have something that could render the Esten Crack moot and thus make completely irrelevant, you know, the trigger decision. In fact, that's why there's no injury. If the administrator during the hearing had decided that the facts aren't there to support imposition of an actual crack, given the facts that intervene between the trigger and the time parties present their testimony in the hearing, there's no – there can't be any injury there. It was just irrelevant. I mean, completely irrelevant to have had the trigger determination. That's why – why review something now when, you know, it might not have even had to be addressed, because there might not have been an Esten Crack. I see the note to sum up. I've spent most of my time on jurisdiction. I'd like to quickly note on the merits that BPA had very good reasons for assuming the proceeds from the Debt Optimization Program were used to pay debt. If we hadn't used those to pay debt, we would have been in deeper debt. And also, the reasons why this program is so appropriate are laid out in the record. All of these are in the record. The benefits of the program include – and I'm sorry this is so quick – restoring and extending BPA's borrowing authority, which is the primary purpose of this program, lowering our overall interest expense, providing us cash flow flexibility, advancing the amortization of our highest interest debt, that is the Federal debt, and reducing our overall fixed costs. On the flip side, if one did what Petitioners argued, they say they should be treated as reserves. They're not reserves. Reserves are for unanticipated events. This – these proceeds were directly intended under a three-year program, three fiscal years, to be used to pay down debt. That's their purpose. They weren't intended to take these proceeds and use them to give them a windfall reduction in their rates. There was a specific purpose for those proceeds. If we had done what they had proposed, there would have been a number of very negative consequences. BPA would have been left virtually defenseless if it ever faced a short-term liquidity problem. It would have jeopardized the future of the debt optimization program, which provides value not just to BPA, but also to its customers over the long term. Also, it would have required a larger S& crack subsequently, or a larger rate increase subsequently. Their proposal just pushes out the issue. It doesn't resolve it properly. And it would have jeopardized the bond ratings on our BPA-backed bonds. They see us telling Energy Northwest we're going to use these proceeds to pay down debt, and we turn around and don't do it. And so we push our debt out farther, and the bond rating agencies get nervous. Well, that makes us very nervous, and it's not good for us or our customers. Also, there's a reference to the petitioner's contracts, and I think it's important to recognize there's really no contract problem here. The contract says that BPA cannot adjust its rates during the term of the contract except for a crack. So the contract says you can do a crack. The only question is whether BPA did the crack pursuant to the GRSPs, and that's an administrative determination that this Court can address. So the issue arises regardless of the existence of any contract. No contract is necessary here. Also, if you look at the language of the contract, the contract refers to things such as application, revision, adjustment of the actual rate, not to the trigger determination. So there is no problem here with the contracts in terms of implementing the hearing. Also, the trigger record is in the rulemaking record. Everything we did for that initial trigger determination, contrary to what counsel said, is part of the rulemaking record. It was there. We knew we didn't have to make that case in its entirety again. We had made the determination, given the documentation, held the workshop. We had gone through this ad infinitum with our customers. When we published our initial proposal, we said in our initial proposal, here's what we did. We triggered it. We triggered it properly. We said that in our initial proposal in the rate hearing. They came in, in the hearing, and said, no, you didn't. But that record from the trigger determination is part of the rulemaking record under Section 9. It doesn't have to be in the hearing. It's in the rulemaking record, which is a subset. I mean, which is, the hearing record is a subset of the rulemaking record under Section 9 of the Northwest Power Act. So I have used up my time. Thank you very much for your time today. Thank you, counsel. Counsel, could you answer a question for me raised by opposing counsel? And that is that by moving ahead, as you have, with this appeal, you have basically jumped out of the chute leaving all of the other claimants and consumers who have challenged this behind, and their views aren't adequately being represented, and they may have contrary views, and all of this would have been and will be heard later, and you're kind of controlling the argument here and possibly preempting them from presenting their arguments. Your Honor, I'm not sure who BPA's counsel is referring to. The Public Power Counsel, who is a petitioner in this case, represents a huge number of entities. I'm not sure I can tell you off the top of my head. Well, that's why I wanted to clear it up, because I don't know either. I mean, I'm not there. But for the most part, I don't know who was left behind. I think if you look at the petitioners who are represented to you before you today, we are representing a very broad range of interests, and I don't know of anyone that's left out behind on this. Well, I couldn't, I was trying to find it in the record as to who was kind of standing at the gate that might have a contrary view. I don't know who that would be, Your Honor. Go ahead. So essentially, it is our very strong view that the trigger determination was not a rate determination because it did not occur in the context of 7i. If you accept that, then the Central Lincoln line of cases do not apply here. Central Lincoln line of cases are rate-making cases. The trigger determination was not rate-making. It, by definition, could not be because it didn't occur in a rate proceeding. So how do you deal with the argument that until a rate is imposed, your clients have not suffered injury? Your Honor You simply have a trigger determination. That starts the process. But there is no actual injury until the rate is approved, right? So explain to me why, from that point of view, wouldn't it be better to say that your claims aren't ripe until the, even though it's different from a rate, that your claims aren't ripe until the rate is imposed? Your Honor, we did suffer very specific injury as a result of the improper trigger determination. That injury was that our contractual rights to have the rates known for the 5-year rate period basically, it went away as a result of the trigger determination. So we no longer had the rate certainty contained in our contracts. As a result of that lack of rate certainty, certain Petitioners did take immediate action. If you take a look at the Administrator's decision to trigger the safety net crack, he states in that letter very clearly that it appears as though there will be a 15 percent rate increase. Therefore, you have to, if you are an industrial operation that relies on a lot of electricity, if you believe that you are facing a 15 percent rate increase, you will take certain courses of action immediately to Give some examples from your clients of how that would play out. Take certain types of action. One such example is one of the aluminum companies took a look at this situation and said, well, if we have a 15 percent rate increase, there's absolutely no way that we can produce aluminum and continue to make money. And so they shut down one of their pot lines as a result of that. You had some of the public agencies initiate their own rate cases because they said, wow, a 15 percent rate increase is huge. We have to start preparing our rate payers for the inevitability that we will have a rate increase. And they began their rate processes. So there were very specific things that happened. This wasn't something that was just we're here before you today because the trigger determination was a very, very significant determination. It was very important. I would, in the few minutes I have left, like to address a couple of other points that I think are extremely important. We fundamentally disagree with BPA regarding what the administrator decided in the context of the 7i hearing. It is absolutely correct that we all made our arguments, and I will tell you, for the first time in the 7i hearing, because keep in mind that the trigger determination was not a public process. The administrator behind closed doors made that decision. There was no public input. Then that decision was announced in the context of these two letters. We raised all of our arguments in the 7i rate-making process, and I would urge you to read the record of decision. What you will find is that the administrator did not rule on the substance of those arguments. The administrator said, as a matter of procedure, you're asking us to revisit our trigger determination that was made before the 7i rate process. So, yes, there are 22 pages of analysis, but they're all going to, they're saying over and over again that procedurally this wasn't the right place to raise these arguments. So I, we strongly, strongly disagree with that. The other quick point that I would like to make is that we aren't suggesting to Bonneville that they use the energy refinance money in any, in any manner. That is clearly within the discretion of the administrator. The only point that we are making, and it's a very narrow point, is that based on the rate schedules, at the point that the administrator triggered the safety net crack, he was required to consider all the cash he had on hand. And that is just simply a mathematical formulation that you have to put all the of making your treasury payment. That does not dictate how that money is used. The administrator says himself that the $76 million was available, it was unencumbered, it was available to make the treasury payment if he got into dire circumstances and needed to use it. His admission absolutely dictates that that $76 million had to be put into the formula. That's all we're saying. We're not saying how that money had to be used subsequently. Thank you. Thank you very much for your arguments. I want to thank both counsel for your excellent presentations in the briefing and in the arguments. I think, Ms. Davidson, if I recall correctly, you were before us in a very complicated BPA case a few years ago that we unfortunately had to schedule the day after New Year's. Lasted all morning. You did a superb job then. The BPA, I don't think you were there, Mr. Cassad, as of yet. I don't think you were probably yet with BPA, but we all commented what an excellent job everybody did in that proceeding. Appreciate your presentations today. It presents some very interesting issues. Thank you very much. The case is here to be submitted and we will be in the jury. All rise. Thank you. Thank you. Thank you.
judges: D Nelson, Thomas, Ezra